UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                                    CASE NO.   6:21-bk-03216-LVV

ROCHELLE HOLDINGS XIII, LLC,

     Debtor.

_____/

## MOTION FOR ORDER CANCELING AUCTION AND APPROVING SALE OF REAL PROPERTY TO KELLY PARK VB DEVELOPMENT, LLC

COMES NOW the Debtor, ROCHELLE HOLDINGS XIII, LLC ("Debtor"), through its undersigned attorney and pursuant to sections 105(a), 363(b), and 363(f) of title 11 of the United States Code ("Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for Middle District of Tampa seeking, files this its Motion for Order Canceling Auction and Approving Sale of Real Property to Kelly Park VB Development, LLC. The Debtor reserve the right to file additional documents and present such further information to the Court as may be appropriate in support of the relief requested in this Motion. In further support of this Motion, the Debtor respectfully states as follows:

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, and Bankruptcy Rules 6004.

## BACKGROUND

4.     The Debtor filed for relief under Title 11, Chapter 11 of the United States Bankruptcy Code on July 15, 2021.

5.     At the time of the filing, the Debtor was a single asset real estate company, whose sole asset consisted of the real property commonly referred to as 4105 Golden Gem Parkway, Apopka, Florida 32712 ("Property").

6.     The Debtor is authorized to continue to operate its business and manage the Property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 case by the United States Trustee.

7.     On January 3, 2022, the Debtor filed its Fourth Amended Plan of Reorganization ("Plan") (Doc No. 114) and its Third Amended Disclosure Statement ("Disclosure Statement") (Doc. No. 115) through which the Debtor is seeking to pay its creditors in full and reorganize through an auction and sale of the Property.

8.     A final evidentiary hearing on confirmation of the Plan and final approval of the Disclosure Statement was originally scheduled for February 4, 2022, and was continued to February 23, 2022.

9.     On January 10, 2022, the Court entered its Order Approving Debtor's Amended Motion for Bid and Sale Procedures, Marketing Procedures, and for Related Relief ("Bid Procedures Order") (Doc. No. 121) thereby authorizing the Debtor to sell the Property at an auction to be held on March 22, 2022 in accordance with the term and procedures set forth in the Bid Procedures Order.

10.    On January 27, 2022, HMG Venture Partner, LLC, PMS-1 REO, LLC and Project Orlando, LLC's (collectively, "HMG/PMS") filed their Objection to Confirmation of the Debtor's

Fourth Amended Plan of Reorganization (Doc. N. 135) and Objection to the Debtor's Third Amended Disclosure Statement (Doc. No 135) taking the position that the Plan is unconfirmable under section 1129 of the Bankruptcy Code and the Disclosure Statement prevented confirmation as it failed to satisfy the requirements of section 1125 of the Bankruptcy Code.

11.    On January 27, 2022, J&R Hewitt Investment Limited Partners ("Hewitt") filed its Objection to Confirmation of Debtor's Fourth Amended Plan of Reorganization (Doc. # 136) and Objection to Third Amended Disclosure Statement filed by Hewitt (Doc. #137) also arguing the Plan was unconfirmable under section 1129 of the Bankruptcy Code and the Disclosure failed to satisfy the requirements of section 1125 of the Bankruptcy Code.

12.    While Project Orlando did not file a Proof of Claim, HMG, PMS and Hewitt filed Proofs of Claims, numbered 4, 5, and 6.

13.    Hewitt filed a claim in this case, namely Claim No. 4, in the amount of $11,391,125.00, for an alleged investment in company/preferred equity interest in the Debtor Rochelle Holdings XIII, LLC.

14.    HMG filed a claim in this case, namely Claim No. 5, in the amount of $3,136,038.26, based upon a judgment and charging order against James Palmer, a member of the Debtor Rochelle Holdings XIII, LLC.

15.    PMS filed a claim in this case, namely Claim No. 6, in the amount of $60,166,871.32, based upon a judgment and charging order against James Palmer, a member of the Debtor Rochelle Holdings XIII, LLC.

16.    The Debtor filed timely Objections (Doc. Nos. 59, 60, 61) to the foregoing claims ("Claims Objections") and the Court has yet to rule on those claims.

17.     Following the filings of the Plan and the objections thereto, the Debtor received an offer to purchase the Property from Kelly Park VB Development, LLC ("Kelly Park").

18.     After receiving this offer, the Debtor, Hewitt, HMG/PMS, and James R. Palmer ("Palmer"), the owner of 99.9% of the Debtor's membership interest, entered into extensive negotiations for purposes of resolving the objections to confirmation and the Disclosure Statement, the Claims Objections and the years of extensive and costly litigation as between Palmer and HMG/PMS.  Through these negotiations the parties where able to settle and resolve the foregoing disputes in accordance with the terms of the Settlement and Release Agreement attached hereto as **Exhibit "A."**

19.     The settlement provides for and is contingent, amongst other things, the following:

a.      The cancelation of the Auction and a sale of the Property directly to Kelly Park.

b.      At the closing of the sale of the Property, Hewitt shall receive $675,000.

c.      At the closing of the sale, HMG/PMS shall receive $675,000.

d.      Hewitt shall be deemed to have no ownership interest in the Debtor Rochelle, but instead shall have an Allowed Claim in the amount of $675,000, to be satisfied in full at closing from the proceeds of the sale.

e.      HMG/PMS shall be deemed to have no ownership interest in the Debtor, but instead shall have an Allowed Claim in the amount of $675,000, to be satisfied in full at closing from the proceeds of the sale.

f.      The parties to the settlement will mutually release each form any and all claims they may have against the other, whether known or known or unknown.   Palmer and HMG/PMS also agree to the dismissal of all pending litigation and the satisfaction of all judgments that HMG/PMS currently hold against Palmer or entities owned by Palmer.

g.      Kelly Park paying to Project Orlando $1,800,000 for the acquisition of certain entitlements that Project Orlando holds related to the Property.

20.     As part of facilitating this settlement and to ensure that all creditors and other parties in interest in this case are paid in full, the Debtor all other parties to this Bankruptcy Case have determined it is appropriate to cancel the Auction and sell the Property direction to Kelly Park pursuant to the terms of the Purchase and Sale Agreement ("Purchase Agreement")[1] attached hereto as **Exhibit "B"** and incorporated by reference.

21.     The following is a summary of the materials terms of the Purchase Agreement:

    a.    Purchase Price   $43,143,439 subject to adjustments.

    b.    Deposit.  Kelly Park has deposited $1,000,000.00 with the Debtor as part of the stalking horse bid made in accordance with the Bid Procedures Order.  Upon the Court canceling the auction and approving the Purchase Agreement, Kelly Park shall deposit an additional $3,143,439 the Debtor to bring the total deposit amount to $4,143,439 or 10% of the purchase price ("Deposit").

    c.    Assets. The Assets to be transferred under the Purchase Agreement is the full 202.5 acres of Property owned by the Debtor.

    d.    Closing Conditions Required by the Purchaser. The Purchaser's obligation to close is conditioned on the fulfillment of each of the following conditions: (i) cancelation of the Auction; (ii) the Bankruptcy Court entering a sale Order approving this Motion, the Purchase Agreement and the sale to Kelly Park; (iii) the Bankruptcy Court entering the Sale Order, and such Sale Order being a Final Order (which condition may be waived by the Purchaser in its sole discretion); and (iv) the Purchase Agreement and transactions contemplated shall not have been declared invalid, unenforceable, or prohibited.

    e.    Closing Date. The Closing will occur on or before April 15, 2022.

22.     Under the settlement described above and through a sale of the Property directly to Kelly Park, the Debtor's secured lenders, RICHARD J. RISSER, Trustee of the RICHARD J. RISSER FAMILY TRUST, dated September 13, 2007, and SHIRLEY R. RISSER, Trustee of

---

[1] The Purchase Agreement attached hereto as Exhibit B has been execute by the Debtor was fully approved as to content and form by Kelly Park.  The Debtor will supplement this filing with the fully executed Purchase Agreement at or before the continued confirmation hearing on February 23, 2022.

the SHIRLEY R. RISSER FAMILY TRUST, dated September 13, 2007 (collectively, "Risser") and Nicholson Investments, LLC will be paid in full at closing.

23.     Further, the Debtor will all have sufficient funds to pay all other claims and parties in interest, including administrative claims, US Trustees fees, and any other allowed expense, and net the Debtor sum certain.

24.     The parties have agreed and the Purchase Agreement will allow the Debtor to pay Robert H Ewald and Ewald Auctions the amount of $465,000 for his services in this case.

25.     Given the foregoing, all creditors, parties in interest, and holders of an equity interest in the Debtor, other than Risseer, are in agreement that is appropriate to (i) cancel the auction, (ii) sell the Property directly to Kelly Park pursuant to the terms of the Purchase Agreement; and (iii) to modify the Plan to provide for the cancelation of the Auction and the direct sale to Kelly Park.

26.     The Debtor believes the sale is in the best interest in the Estate, all creditors of the Estate, and all persons or entities that claim an interest in the Estate either directly or through Palmer's 99.9% membership interest in the Debtor as all parties will be paid in full from the sale to Kelly Park and all parties to this have approved the sale and agreed to the cancelation of the auction.

27.     Just hours before the filing of this Motion, the Debtor was informed that the Rissers have changed their positon and they now object to the relief being sought herein.  It is not clear why the Rissers objection to the relief being sought herein as they will be paid in full if the through the sale to Kelly Park and the auction will not be canceled unless and until Kelly Park pays the full 10% deposit described above and required by the Purchase Agreement.

**BASIS FOR RELIEF**

28.     Bankruptcy Code section 363(b) governs transactions outside the ordinary course of business involving property of the debtor's estate. Specifically, that section provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate" 11 U.S.C. § 363(b).

29.     The Debtor's sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Debtor can demonstrate a sound business justification for the proposed transaction. *See In re Chrysler LLC*, 576 F.3d 108, 117-18 (2d Cir. 2009), *citing In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007).

30.     In addition, Bankruptcy Code section 105(a) grants the Court the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

31.     The Debtor submits that the Purchase Price is fair and reasonable considering in that it will pay all creditors and parties in interest in full and the Debtor has not received any similar offers that will allow the Debtor to resolve this case and the other ancillary litigation related to this case.  Finally, any concern that the Debtor may be able to sell the Property on better overall terms than those provided for in the Purchase Agreement if the Auction goes forward should be allayed by the fact that Kelly Park was selected as the stalking horse for the Auction, all parties have reviewed and approved the Purchase Agreement, and all creditors and claims will be paid in full through the sale to Kelly Park.

32.     It is also appropriate for this Court to approve of the sale of the Property to Kelly Park free and clear of any and all liens, claims, or encumbrances.  Pursuant to section 363(f) of the Bankruptcy Code, the Debtor may sell property under Bankruptcy Code section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (a)

applicable nonbankruptcy law permits the sale of the property free and clear of such interest; (b) the entity holding the lien, claim, or encumbrance consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f).

33.    Pursuant to the Purchase Agreement, the Debtor requests that the Court authorize the sale of the Property free and clear of all liens, claims, encumbrances, and other interests, including possessory leasehold interests (collectively, "Liens").

34.    Additionally, under the order approving this Motion, Kelly Park shall not be liable for any claims against the Debtor or any of its respective predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, de facto merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables between the Debtor and any non-debtor subsidiary, liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Property prior to Closing.

35.    The sale of the Property will satisfy section 363(f) because, as described above, any entities holding Liens on the Property will have received notice of this Motion, the purchase price exceeds the value of all Liens against the Property, and all parties holding Liens on the

Property have consented to and approved the sale of the Property to Kelly Park or they will be paid in full up the sale of the Property.

36. It is also appropriate for this Court to afford Kelly Park all of the protections provided for under Section 363(m) of the Bankruptcy Code.

37. Section 363(m) protects a good faith purchaser's interest in property purchased from the debtor notwithstanding that the sale conducted under section 363(b) was later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

38. Here, Kelly Park and Debtor have satisfied the requirements of Section 363(m). The Purchase Agreement is the result of extended arm's-length, good-faith negotiations between the Debtor and Kelly Park, each represented by their respective professionals. The Debtor submits that the Purchaser is a "good-faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and should be entitled to its protection. Accordingly, the Debtor requests that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

39. Finally, the Debtor hereby requests that the Court shorten the notice period for approving the sale of the Property to Kelly Park as all creditors, equity holders, and parties in interest, have been involved with approving the sale to Kelly Park and do not object to the sale.

40. Bankruptcy Rule 6004 prescribes the notice that must be given of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code. Pursuant to Bankruptcy Rule 6004(a), notice must be given of a proposed use, sale, or lease of property, not in the ordinary

course of business, which satisfies the requirements of Bankruptcy Rule 2002(a)(2) and (c)(1), among others.

41.     Bankruptcy Rule 2002(a) requires that "the clerk, or some other person as the court may direct," give "the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of: … (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business…." Fed. R. Bankr. P. 2002(a). Bankruptcy Rule 2002(c) requires that this notice include "the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c).

42.     Bankruptcy Rule 6004(c) requires that a motion pursuant to section 363(f) of the Bankruptcy Code for authority to sell property free and clear of liens or other interests "shall be served on the parties who have liens or other interests in the property to be sold." Fed. R. Bankr. P. 6004(c).

43.     As indicated above, all creditors and parties in interest are fully aware of the terms of the private sale to Kelly Park and have had the opportunity to review, comment on and raise objection to the Purchase Agreement.  Further, the secured creditors are aware of the sale to Kelly Park and have either consented to the sale or will be paid in full upon the sale of the Property.

44.     The Debtor also submits that the interest meant to be protected by the notice provisions found in Bankruptcy Rules 6004 and 2002 have been fully protected based on the parties participation in the sale process to date and would request that the Court find that the Debtor has satisfied the notice requirements of Bankruptcy Rule 6004.  To the extent necessary, the Debtor would requests that the Court shorten these notice provisions as part of finding that the Debtor has complied with the same.

WHEREFORE, the Debtor, ROCHELLE HOLDINGS XIII, LLC, pray this Court enter an Order: (i) canceling the Auction and all deadlines associated with the auction; (ii) approving the Purchase Agreement and sale of the Property to Kelly Park; (iii) granting all other relief sought in this Motion; and (iv) granting such other and further relief as this Court deems appropriate and just.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of this has been furnished by United States Mail to United States Trustee, 135 W. Central Blvd., #620, Orlando, Florida 32801, Internal Revenue Service, P.O. Box 21126, Philadelphia, PA 19114, The Securities and Exchange Commission, Branch of Reorganization, 175 West Jackson Street, Ste. 900, Chicago, IL 60604-2601, and to all parties listed on the attached mailing matrix and any parties receiving mail by ECF, this 22nd day of February, 2022.

*/s/ Lawrence M. Kosto*
Lawrence M. Kosto, Esquire
KOSTO & ROTELLA, P.A.
619 E. Washington Street
P.O. Box 113
Orlando, FL 32802
Telephone No.: (407) 425-3456
Facsimile No.: (407) 423-9002
FL Bar No.: 0765325
Attorney for Debtor

# EXHIBIT "A"

**THIS AGREEMENT AND THE MUTUAL RELEASES CONTAINED HEREIN SHALL BECOME EFFECTIVE UPON THE OCCURRENCE OF ALL CONDITIONS TO EFFECTIVENESS OF RELEASES SET FORTH IN SECTION 3 OF THIS SETTLEMENT AND RELEASE AGREEMENT**

## SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (the "Agreement") dated as of February 22, 2022, by and among HMG Venture Partners, LLC, a Florida limited liability company ("HMG"), PM S-1 REO, LLC, a Florida limited liability company ("PMS"), Charles M. Pinckney, an individual ("Pinckney"), Adam H. Cohen, an individual ("Cohen"), J & R Hewitt Investments Limited Partnership ("Hewitt"), James R. Palmer, an individual ("Palmer"), Matt Hill, an individual, Connie Jo Payne, an individual, Ron Palmer, an individual, Rochelle Holdings XIII, LLC, a Florida limited lability company ("Rochelle XIII"), and Rochelle Holdings, LLC, a Florida limited liability company ("Rochelle"). Together, the foregoing parties to this Agreement shall be referred to herein collectively as the "Parties," and each, a "Party."

## BACKGROUND

**I.    MMA Litigation:**

A.    On June 11, 2010, HMG's predecessor in interest, MMA Realty Capital, LLC ("MMA") filed a complaint against Palmer seeking foreclosure of the security for a $15.8 million loan which had been made to Palmer's entities on April 4, 2007. The case was filed in the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida, styled *MMA Realty Capital, LLC v. James R. Palmer, et al.,* Case No.: 2010-CA-013552. This litigation resulted in a settlement agreement with Palmer, but Palmer failed to make any payments thereby breaching the terms of the settlement agreement.

B.    As a result of Palmer's breach of the settlement agreement, MMA filed a complaint against Palmer in case styled *MMA Realty Capital, LLC v. James R. Palmer,* Case No 2014-CA-11784-O (the "MMA Litigation"). On December 15, 2017, the court entered a Final Judgment against Palmer in the original principal amount of $2,333,529.73 ("MMA Judgment").

C.    In 2017, MMA discovered that Palmer had fraudulently transferred his 99.9% membership interest in Rochelle Holdings XIII, LLC ("Rochelle XIII") and his 100% membership interest in Project Orlando, LLC from personal to joint ownership with his wife. To avoid these transfer, MMA filed a proceeding supplementary in case styled *MMA Realty Capital, LLC v. James R. Palmer*, Supp. Proc. No. 2017-CA-007216-O (the "MMA Transfer Litigation").

D.    The MMA Transfer Litigation resulted in the entry of an Order Granting Motion for Summary Judgment and Related Relief in Proceeding Supplementary Concerning Select Assets ("Fraudulent Transfer Judgment"). The Fraudulent Transfer Judgment (i) entered judgment in favor of MMA in the amount of $2,720,874.55, (ii) avoided the fraudulent transfers, (iii) re-vested ownership of the entities listed in the judgment, including Rochelle XIII, in Palmer individually, (iv) entered a charging order against Palmer's membership interest in each entity, including against

Palmer's 99.9% interest in the Debtor (the "MMA Charging Order"), and (v) foreclosed Palmer's membership interest in Project Orlando vesting full ownership of Project Orlando in MMA.

E.      On December 20, 2019, MMA assigned its rights under the MMA Judgment, Fraudulent Transfer Judgment and MMA Charging Order to HMG pursuant to that certain Assignment of Judgment thereby making HMG the party with standing to enforce the MMA Judgment and MMA Charging Order.

F.      On or about February 26, 2020, HMG took title to Project Orlando pursuant to the terms of that certain Amended Certificate of Title entered in the MMA Litigation thereby making HMG the owner of 100% of the membership interest in Project Orlando and owner of the company.

## II.    PSP Litigation

G.      In 2013, an affiliate of PMS, PSP/MRC Debt Portfolio S-1, L.P ("PSP"), filed a foreclosure lawsuit against Project Orlando and Palmer as guarantor in the case styled *PSP/MRC Debt Portfolio S-1, LP v. Project Orlando, LLC,* Case No.: 2013-CA-005076-O (the " Foreclosure Litigation). The 2013 Foreclosure Litigation related to a 2006 loan made to Project Orlando in the amount of $46,000,000 that was secured by 800 acres of property in Apopka, Florida.

H.      On April 14, 2018, a final summary judgment of foreclosure was entered against Project Orlando and Palmer, in the amount of $80,113,598.61.

I.      On October 21, 2019, PMS obtained a Deficiency Judgment against Palmer in the in the amount of $54,279,641.88 ("Deficiency Judgment").

J.      Due to Palmer's failure to pay the Deficiency Judgment, on May 15, 2020, PSP obtained a charging order against Palmer's 99.9% membership interest in the Rochelle XIII and various other LLC's[1] pursuant to the Order Granting Plaintiff's Motion for Charging Order Against Palmer Entities and Appointment of Receiver to Enforce Charging Orders (the "PSP Charging Order"). The MMA Charging Order and the PSP Charging Order shall collectively be referred to herein as the "Charging Orders".

K.      On December 1, 2020, PSP assigned its rights and interest in the Deficiency Judgment and the PSP Charging Order to PMS pursuant to that certain Assignment recorded in the public records of Orange County, Florida thereby making PMS the party with standing to enforce the Deficiency Judgment and PSP Charging Order.

---

[1] In addition to Rochelle XIII, the PSP Charging Order provided PSP with a lien against Palmer's membership interest in the following entities: (i) 100% membership interest in Rochelle Holdings, LLC and Project Orlando; (ii) 99.9% membership in Rochelle Holdings II, LLC, Rochelle Holdings V, LLC, Lincoln Corn Farms I, LLC, Rochelle Holdings, VIII, LLC, Rochelle Holdings XI, LLC, Rochelle Holdings XII, LLC, Rochelle Holdings XIV, LLC, and Lincoln Corn Farms, LLC; (iii) 75% membership interest in Rockford Enterprises I, LLC, and Brantley Homes, LLC; (IV) 50% membership interest in Brantley Investments I, LLC, Dekalb Farms, LLC, and Whistler Mountain, LLC; and (v) 1% membership interest in TTP, LLC.

### III.    Rochelle XIII Chapter 11 Bankruptcy Filing

L.    On July 15, 2021, Rochelle XIII filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in in the United States Bankruptcy Court for the Middle District of Florida thereby commencing case styled *In re: Rochelle Holdings XIII, LLC*, Case No. 6:21-bk-03216-LVV ("Bankruptcy Case")

M.    On September 23, 2021, HMG and PMS filed Claims No. 5 and 6, respectively, thereby asserting that the Charging Orders make them and parties in interest in the Bankruptcy Case with the right to participate and receive a distribution under any confirmed Chapter 11 plan.

N.    On September 27, 2021, Rochelle filed its Objections to Claim No. 5 and No. 6 thereby objecting to HMG and PSP's right to participate in the bankruptcy case and alleging that Rochelle XIII had no obligation to make any payments either HMG or PSP.

O.    On January 3, 2022, Rochelle XIII filed its Third Amended Disclosure Statement and Fourth Amended Chapter 11 Plan ("Plan").  Under the Plan, Rochelle XIII is seeking to reorganize its obligations by liquidating the real property located at 4105 Golden Gem Road, Apopka, FL 32713 (the "Property") pursuant to an auction to be held on March ____, 2022 ("Auction").

P.    HMG and PSM filed timely objections to the Plan alleging that the Plan was filed in bad faith for purposes of avoiding Palmer's obligations to HMG and PSM under the Charging Orders and associated judgments and is otherwise unconformable under sections 1125 and 1129 of the Bankruptcy Code ("HMG/PSM Plan Objections").

Q.    Following the filing of the Plan and HMG/PSM Objections, Rochelle XIII received a $44 million offer to purchase the Property form Kelly Park VB Development, LLC ("Kelly Park").  After extensive negotiations, Kelly Park has agreed to purchase the Property for $42,200,000 with said offer being contingent on the cancelation of the Auction and direct sale to Kelly Park ("Kelly Park Agreement").

R.    To facilitate the sale of the Property to Kelly Park and after extensive settlement discussion, the Parties have agreed to resolve all disputes and issues related to the MMA Judgment, Deficiency Judgment, Charging Orders, Plan, and HMG/PSM Plan Objections on the terms set forth in this Agreement.

### IV.    The Hewitt Claim

S.    On or about September 23, 2021, Hewitt filed a claim in the bankruptcy case, namely Claim No. 4, in the amount of $11,391,125.00, for an alleged investment in company/preferred equity interest in the Debtor Rochelle Holdings XIII, LLC.

T.    The Debtor Rochelle disputes the validity of the Hewitt claim, and asserts Hewitt is neither a creditor of the Debtor, nor a holder of any interest in the Debtor.

U.      On or about September 27, 2021, Rochelle objected to the claim of Hewitt.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## OPERATIVE TERMS

The parties agree as follows:

1.      <u>Recitals</u>.  The foregoing recitals are confirmed by the parties and are incorporated herein by reference.  The recitals are a substantive, contractual part of this Agreement.

2.      <u>Settlement Terms</u>. In consideration of the Parties performance of their respective obligations under this Agreement and subject to the Conditions to Effectiveness of Release, the Parties agree that they shall mutually release and forever discharge each other form any and all claims or causes of action in accordance with the Mutual Release and Dismissal of Litigation provisions set forth below.

3.      <u>Conditions to Effectiveness of Release</u>.  The Mutual Release provide for in this Agreement is subject to and conditioned upon the satisfaction of the following conditions on or before April 15, 2022, unless a different date is specified in the conditions:

  a.      A final order shall have been entered in the Bankruptcy Case: (i) terminating the Auction; (ii) approving the Kelly Park Agreement; and (iii) approving the sale of the Property to Kelly Park or its assigns pursuant to sections 363(b), (f), and (m) of the Bankruptcy Code.

  b.      Unless the Parties agree to waive the requirements of this section 3(b), The Bankruptcy Court shall have entered a final order approving this Agreement and the releases provided for herein.  Immediately upon execution of this Agreement, counsel for the Debtor shall prepare and cause to be filed with the Bankruptcy Court a Motion to Approve Compromise pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, which shall request the Court approve this Agreement.  The parties acknowledge that the Court could enter a different order approving this agreement; except to any extent that any such different order would material modify this Agreement or prevent the exact fulfillment of each Party's obligations under the Agreement, any such different order will be acceptable to the Parties.

  c.      A final agreed confirmation order ("<u>Confirmation Order</u>") approving the Plan shall have been entered in the Bankruptcy Case in a form satisfactory and approved by the Parties.  The Confirmation Order shall amend the Plan and including the following terms: that the Auction shall be terminated and the Plan funded by the sale of the Property directly to Kelly Park or its assigns pursuant to the terms of the Kelly Park Agreement.

    i.      The Auction shall be canceled and the Property sold directly to Kelly Park;

4

     ii.     The Court approve the sale of the Property to Kelly Park pursuant to section 363(b), (f) and (m) of the Bankruptcy Code.

     iii.     Hewitt shall have an Allowed Claim in the amount of Six Hundred Seventy-Five Thousand Dollars ($675,000), to be paid at the closing of the sale between the Debtor and Kelly Park;

     iv.     That Hewitt shall be determined to have no equity interest in the Debtor Rochelle, but Hewitt shall have an Allowed Claim as set forth in subsection 3(c).

     v.     HMG/PMS shall have an Allowed Claim in the amount of Six Hundred Seventy-Five Thousand Dollars ($675,000), to be paid at the closing of the sale between the Debtor and Kelly Park;

     vi.     Richard J. Risser Family Trust and Shirley R. Risser Family Trust shall have an Allowed Secured Claim in the amount of $28,420,686.00;

     vii.     Nicholson Investments, LLC shall have an Allowed Secured Claim in the amount of $4,617,753.00; and

     viii.     To the extent not already provided for herein, Rochelle XIII, HMG, PMS, Hewitt, and Project Orlando shall provide each other with full and final releases.

     d.     Kelly Park or its assigns shall have paid to HMG or Project Orlando the amount of One Million Eight Hundred Thousand Dollars ($1,800,000.00) for the purchase of 100% of the membership interests in Project Orlando from HMG or the acquisition of those certain entitles current owned and controlled by Project Orlando. But for this payment, HMG/PMS would not be entering into this Agreement or supporting the sale of the Property to Kelly Park.

     e.     The closing of the sale to Kelly Park or its assigns on or before April 15, 2022, and satisfaction of the payment obligations set forth in Section 3(c) at closing of that sale.

     4.     <u>Consent to Confirmation of Plan</u>. Subject to the Bankruptcy Court agreeing to enter the sale order and confirmation order including the terms required under Sections 3(a) and 3(c) above, Hewitt and HMG/PMS agree to: (i) withdraw their objections to the Plan and Disclosure Statement; (ii) support confirmation of the Plan and final approval of the Disclosure Statement; and (iii) agree they will not interpose any objections nor interference with final approval of the Plan that includes the terms set forth in Section 3(c).

     5.     <u>Mutual Releases</u>.

a.      In consideration of the covenants, agreements and undertakings of the Parties under this Agreement and subject to the occurrence of all Conditions to the Effectiveness of the Release set forth in section 3 above, each Party, on behalf of itself and its respective present and former parents, subsidiaries, affiliates, managers, officers, directors, shareholders, members, successors, and assigns (collectively, "Releasors") hereby releases, waives, and forever discharges the other Party and its respective present and former, direct and indirect, parents, subsidiaries, affiliates, employees, officers, directors, partners, shareholders, members, agents, representatives, permitted successors, and permitted assigns (collectively, "Releasees") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty, or equity (collectively, "Claims"), which any of such Releasors ever had, now have, or hereafter can, shall, or may have against any of such Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the date of this Agreement arising out of or in any way relating to the MMA Litigation, MMA Transfer Litigation, MMA Judgment, Fraudulent Transfer Judgment, MMA Charging Order, Foreclosure Litigation and the real property that was the subject of that ligation, the Deficiency Judgment, PSP Charging Order, Bankruptcy Case or any other matter or dealing between the Parties, except for any Claims relating to rights and obligations preserved by, created by or otherwise arising out of this Agreement.

b.      Each Releasor understands that it may later discover Claims or facts that may be different from, or in addition to, those that it or any other Releasor now knows or believes to exist regarding the subject matter of the release contained in this **Error! Bookmark not defined.**4, and which, if known at the time of signing this Agreement, may have materially affected this Agreement and such Party's decision to enter into it and grant the release contained in this **Error! Bookmark not defined.**4. Nevertheless, the Releasors intend to fully, finally and forever settle and release all Claims that now exist, may exist, or previously existed, as set out in the release contained in this **Error! Bookmark not defined.**4, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts.

6.      Dismissal of Litigation and Satisfaction of Claims.    In consideration of the covenants, agreements and undertakings of the Parties under this Agreement and subject to the occurrence of all Conditions to the Effectiveness of the Release set forth in section 3 above, HMG and PMS shall do the following within ten (10) days of the satisfaction of all pre-conditions set forth in section 3 above"

a.      File an appropriate satisfaction of the MMA Judgment and dismissal with prejudice of the MMA Litigation with prejudice, with each party to bear their own fees and costs.

b.      File an appropriate satisfaction of the Fraudulent Transfer Judgment and dismissal of the Proceeding Supplementary with prejudice, with each party to bear their own fees and costs.

c.      File an appropriate satisfaction of the Deficiency Judgment and dismissal of the Foreclosure Litigation with Prejudice, with each party to bear their own fees and costs.

d.      File an appropriate judgment lien satisfaction with the Florida Secretary of State File Judgment Lien Statement, terminating any judgment lien against James Palmer, Connie Palmer or Ron Palmer or anyone else regarding the Judgments at issue in this matter.

7.      <u>Third Party Beneficiaries</u>.  Kelly Park Development Company, LLC d/b/a Kelly Park Land Holding Company, LLC, Morrison Grove Capital Advisors, LLC, Morrison Grove Capital Investments, LLC, Wekiva Land VPI, LLC, PSPIB Realty US, Inc, PSP/MRC Debt Portfolio S-1, LP, a Delaware limited partnership, Charles M. Pinckney, LLC, Johnson Holdings, LLC, PSPIB-RE Finance II, Inc., a corporation incorporated under the Canadian Business Corporate Act,  Mark H. Johnson, James C. Barden, and Brian Marron are express third party beneficiaries of this Agreement and the Mutual Release provided for herein and shall be deemed Releasees for purposes of this Agreement.  As third party beneficiaries, the parties set forth in this section six shall be entitled to enforce and receive the benefit of the Mutual Release contained in Section 5 above.

8.      <u>Representations and Warranties</u>. Each Party hereby represents and warrants to the other Party that:

a.      It has the full right, power and authority to enter into this Agreement, to grant the release contained herein and to perform its obligations hereunder.

b.      The execution of this Agreement by the individual whose signature is set out at the end of this Agreement on behalf of such Party, and the delivery of this Agreement by such Party, have been duly authorized by all necessary corporate action on the part of such Party.

c.      This Agreement has been executed and delivered by such Party and (assuming due authorization, execution and delivery by the other Party hereto) constitutes the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

d.      It (i) knows of no Claims against the other Party relating to or arising out of any matter not specifically referenced in the release covered by the release contained in **Error! Bookmark not defined.Error! Reference source not found.** and (ii) has neither

assigned nor transferred any of the Claims released herein to any person or entity and no person or entity has subrogated to or has any interest or rights in any Claims.

EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 4 OF THIS RELEASE AGREEMENT, (A) NEITHER PARTY HERETO NOR ANY PERSON ON SUCH PARTY'S BEHALF HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WHATSOEVER, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (B) EACH PARTY HERETO ACKNOWLEDGES THAT, IN ENTERING INTO THIS AGREEMENT, IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE OTHER PARTY, OR ANY OTHER PERSON ON SUCH OTHER PARTY'S BEHALF, EXCEPT AS SPECIFICALLY PROVIDED IN THIS SECTION 4.

9.    <u>Publicity and Announcements</u>. During the two (2) year period beginning on the full execution of this Agreement, no Party shall make, publish, or communicate to any person or entity or in any public forum any comments or statements (written or oral) that intentionally seek to denigrate or disparage, or are detrimental to, the reputation or stature of the other Party or its businesses, or any of its employees, directors and officers, and existing and prospective customers, suppliers, investors and other associated third parties.

10.    <u>Miscellaneous</u>.

a.    Any notices, requests, consents, claims, demands, waivers, summons, or other legal process, or similar types of communications hereunder (each, a "<u>Notice</u>") must be in writing and addressed to the relevant Party.  All Notices must be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or regular first class mail. A Notice is effective only if the Party giving the Notice has complied with the requirements of this section 10(a).

b.    This Agreement and all matters arising out of or relating to this Agreements governed by, and construed in accordance with, the laws of the State of Florida, without regard to the conflict of laws provisions of such State. Any legal suit, action, or proceeding arising out of or relating to this Agreement must be instituted in the federal courts of the United States of America or the courts of the State of Florida, in each case located in the City of Orlando and County of Orange, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document in accordance with Section 10(a) will be effective service of process for any suit, action or other proceeding brought in any such court.

c.    This Agreement, and each of the terms and provisions hereof, may only be amended, modified, waived, or supplemented by an agreement in writing signed by each Party.

d.      Neither Party may assign, transfer, or delegate any or all of its rights or obligations under this Agreement without the prior written consent of the other party; provided, however, that either Party may assign this Agreement to an affiliate, a successor-in-interest by consolidation, merger or operation of law or to a purchaser of all or substantially all of the Party's assets. No assignment will relieve the assigning party of any of its obligations hereunder. Any attempted assignment, transfer, or other conveyance in violation of the foregoing will be null and void. This Agreement will inure to the benefit of and be binding on each of the Parties and each of their respective permitted successors and permitted assigns.

e.      This Release Agreement may be executed in counterparts, each of which is deemed an original, but all of which constitute one and the same agreement. Delivery of an executed counterpart of this Agreement electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Agreement.

f.      For purposes of this Agreement, (i) the words "include," "includes" and "including" are deemed to be followed by the words "without limitation"; (ii) the word "or" is not exclusive; (iii) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole; (iv) words denoting the singular have a comparable meaning when used in the plural, and vice-versa; and (v) words denoting any gender include all genders. The Parties drafted this Agreement without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

g.      The headings in this Agreement are for reference only and do not affect the interpretation of this Release Agreement.

h.      If any term or provision of this Release Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Release Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction; provided, however, that if any fundamental term or provision of this Agreement (including Section 4) is invalid, illegal, or unenforceable, the remainder of this agreement shall be unenforceable. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

i.      This Agreement is the sole and entire agreement of the Parties regarding the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter.

j.      Each Party shall pay its own costs and expenses in connection with the drafting, negotiation, and execution of this Agreement (including the fees and expenses of its advisors, accountants, and legal counsel).

k.      Except as expressly set out in the second sentence of this Section 10(k), this Agreement benefits solely the Parties hereto, the Third Party Beneficiaries identify above and their respective permitted successors and permitted assigns, and nothing in this Agreement, express or implied, confers on any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. The Parties hereby designate all Releasees and the Third Party Beneficiaries as third-party beneficiaries of **Error! Bookmark not defined.**4, having the right to enforce such Section.

l.      If any action at law or in equity is brought to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to all costs, attorneys' fees, and expenses incurred by such party in connection with, or incident to, such action, including, without limitation, all court costs and reasonable legal and accounting fees, costs, and disbursements, at all levels of litigation, appeal, or in bankruptcy, in addition to any other relief to which such party may be entitled.

11.    **WAIVER OF JURY TRIAL. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY FURTHER WAIVE ANY RIGHT IT MAY HAVE TO SEEK TO CONSOLIDATE ANY SUCH LITIGATION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LITIGATION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THE PARTIES ACKNOWLEDGE THAT THE PROVISIONS OF THIS SECTION ARE A MATERIAL INDUCEMENT TO THEIR EXECUTION AND ACCEPTANCE OF THIS AGREEMENT.**

[Signatures Begin on Following Page]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth above:

| **HMG Venture Partner, LLC,** | **Rochelle Holdings XIII, LLC** |
|---|---|
| By: _C. M. Pinckney_ <br> Print Name: _C. Pinckney_ <br><br> Patrick M. Mosley, Esq. <br> Florida Bar No. 0033735 <br> Jessica A. Clemente <br> Florida Bar No. 1003462 <br> HILL WARD HENDERSON <br> 101 East Kennedy Boulevard, Suite 3700 <br> Tampa, FL 33602 <br> Telephone: (813) 221-3900 <br> Facsimile: (813) 221-2900 <br> E-Mail: patrick.mosley@hwhlaw.com <br> E-Mail: jessica.clemente@hwhlaw.com <br> E-Mail: tricia.elam@hwhlaw.com <br> *Counsel for HMG Venture Partner, LLC,* <br> *PM S-1 REO, LLC and Project Orlando,* <br> *LLC* | By: _____ <br> Print Name:_____ <br><br> */s/ Lawrence M. Kosto* <br> Lawrence M. Kosto, Esquire <br> FL Bar No. 0765325 <br> Kosto & Rotella, P.A. <br> 619 E. Washington Street <br> Orlando, FL 32801 <br> Telephone: 407-425-3456 <br> Facsimile: 407-423-9002 <br> Service Email: <br> larry.kosto@kostoandrotella.com <br> Corres. Email: lkosto@kostoandrotella.com <br> Secondary Email: <br> lmksec@kostoandrotella.com <br> *Attorneys for the Debtor* |

| **PM S-1 REO, LLC** | **Project Orlando, LLC** |
|---|---|
| By: _C. M. Pinckney_ <br> Print Name: _C. Pinckney_ <br><br> Patrick M. Mosley, Esq. <br> Florida Bar No. 0033735 <br> Jessica A. Clemente <br> Florida Bar No. 1003462 <br> HILL WARD HENDERSON <br> 101 East Kennedy Boulevard, Suite 3700 <br> Tampa, FL 33602 <br> Telephone: (813) 221-3900 <br> Facsimile: (813) 221-2900 <br> E-Mail: patrick.mosley@hwhlaw.com | By: _C. M. Pinckney_ <br> Print Name: _C. Pinckney_ <br><br> Patrick M. Mosley, Esq. <br> Florida Bar No. 0033735 <br> Jessica A. Clemente <br> Florida Bar No. 1003462 <br> HILL WARD HENDERSON <br> 101 East Kennedy Boulevard, Suite 3700 <br> Tampa, FL 33602 <br> Telephone: (813) 221-3900 <br> Facsimile: (813) 221-2900 <br> E-Mail: patrick.mosley@hwhlaw.com |

| | |
|---|---|
| E-Mail: jessica.clemente@hwhlaw.com<br>E-Mail: tricia.elam@hwhlaw.com<br>*Counsel for PM S-1 REO, LLC* | E-Mail: jessica.clemente@hwhlaw.com<br>E-Mail: tricia.elam@hwhlaw.com<br>*Counsel for Project Orlando, LLC* |
| **J & R Hewitt Investments Limited Partnership**<br><br>By: _____<br>Print Name:_____<br><br><br>_____<br>Ryan E. Davis, Esq.<br>Florida Bar No. 0179851<br>Lauren M. Reynolds<br>Florida Bar No. 112141<br>WINDERWEEDLE, HAINES, WARD &<br>WOODMAN, P.A.<br>329 Park Avenue North, Second Floor<br>Post Office Box 880<br>Orlando, FL 32790-0880<br>Telephone: (407) 423-4246<br>Facsimile: (407) 645-3728<br>E-Mail: rdavis@whww.com<br>E-Mail: lreynolds@whww.com<br>*Counsel for J & R Hewitt Investments Limited Partnership* | _____<br>JAMES R. PALMER<br><br><br>_____<br>RON PALMER<br><br><br>_____<br>CONNIE JO PAYNE<br><br>_____<br>CHARLES M. PINCKNEY<br><br>_____<br>MATT HILL<br><br>_____<br>ADAM H, COHEN |

| E-Mail: jessica.clemente@hwhlaw.com<br>E-Mail: tricia.elam@hwhlaw.com<br>*Counsel for PM S-1 REO, LLC* | E-Mail: jessica.clemente@hwhlaw.com<br>E-Mail: tricia.elam@hwhlaw.com<br>*Counsel for Project Orlando, LLC* |
|---|---|

| **J & R Hewitt Investments Limited Partnership**<br><br>By: _____<br>Print Name:_____<br><br>_____<br>Ryan E. Davis, Esq.<br>Florida Bar No. 0179851<br>Lauren M. Reynolds<br>Florida Bar No. 112141<br>WINDERWEEDLE, HAINES, WARD &<br>WOODMAN, P.A.<br>329 Park Avenue North, Second Floor<br>Post Office Box 880<br>Orlando, FL 32790-0880<br>Telephone: (407) 423-4246<br>Facsimile: (407) 645-3728<br>E-Mail: rdavis@whww.com<br>E-Mail: lreynolds@whww.com<br>*Counsel for J & R Hewitt Investments Limited Partnership* | _____<br>JAMES R. PALMER<br><br>_____<br>RON PALMER<br><br>_____<br>CONNIE JO PAYNE<br><br><br>_____<br>CHARLES M. PINCKNEY<br><br>_____<br>MATT HILL<br><br>_____<br>ADAM H, COHEN |

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth above:

| **HMG Venture Partner, LLC,** | **Rochelle Holdings XIII, LLC** |
|---|---|
| By: _____ <br> Print Name:_____ | *Managing Member* <br> By: _____ <br> Print Name: *Matthew R. Hill* |
| Patrick M. Mosley, Esq. <br> Florida Bar No. 0033735 <br> Jessica A. Clemente <br> Florida Bar No. 1003462 <br> HILL WARD HENDERSON <br> 101 East Kennedy Boulevard, Suite 3700 <br> Tampa, FL 33602 <br> Telephone: (813) 221-3900 <br> Facsimile: (813) 221-2900 <br> E-Mail: patrick.mosley@hwhlaw.com <br> E-Mail: jessica.clemente@hwhlaw.com <br> E-Mail: tricia.elam@hwhlaw.com <br> *Counsel for HMG Venture Partner, LLC,* <br> *PM S-1 REO, LLC and Project Orlando,* <br> *LLC* | */s/ Lawrence M. Kosto* <br> Lawrence M. Kosto, Esquire <br> FL Bar No. 0765325 <br> Kosto & Rotella, P.A. <br> 619 E. Washington Street <br> Orlando, FL 32801 <br> Telephone: 407-425-3456 <br> Facsimile: 407-423-9002 <br> Service Email: <br> larry.kosto@kostoandrotella.com <br> Corres. Email: lkosto@kostoandrotella.com <br> Secondary Email: <br> lmksec@kostoandrotella.com <br> *Attorneys for the Debtor* |

| **PM S-1 REO, LLC** | **Project Orlando, LLC** |
|---|---|
| By: _____ <br> Print Name:_____ | By: _____ <br> Print Name:_____ |
| Patrick M. Mosley, Esq. <br> Florida Bar No. 0033735 <br> Jessica A. Clemente <br> Florida Bar No. 1003462 <br> HILL WARD HENDERSON <br> 101 East Kennedy Boulevard, Suite 3700 <br> Tampa, FL 33602 <br> Telephone: (813) 221-3900 <br> Facsimile: (813) 221-2900 <br> E-Mail: patrick.mosley@hwhlaw.com | Patrick M. Mosley, Esq. <br> Florida Bar No. 0033735 <br> Jessica A. Clemente <br> Florida Bar No. 1003462 <br> HILL WARD HENDERSON <br> 101 East Kennedy Boulevard, Suite 3700 <br> Tampa, FL 33602 <br> Telephone: (813) 221-3900 <br> Facsimile: (813) 221-2900 <br> E-Mail: patrick.mosley@hwhlaw.com |

| E-Mail: jessica.clemente@hwhlaw.com<br>E-Mail: tricia.elam@hwhlaw.com<br>*Counsel for PM S-1 REO, LLC* | E-Mail: jessica.clemente@hwhlaw.com<br>E-Mail: tricia.elam@hwhlaw.com<br>*Counsel for Project Orlando, LLC* |
|---|---|

| **J & R Hewitt Investments Limited Partnership**<br><br>By: _____<br>Print Name: *Benjamin Hewitt*<br>*POA*<br><br>*Ryan E. Davis*<br>Ryan E. Davis, Esq.<br>Florida Bar No. 0179851<br>Lauren M. Reynolds<br>Florida Bar No. 112141<br>WINDERWEEDLE, HAINES, WARD &<br>WOODMAN, P.A.<br>329 Park Avenue North, Second Floor<br>Post Office Box 880<br>Orlando, FL 32790-0880<br>Telephone: (407) 423-4246<br>Facsimile: (407) 645-3728<br>E-Mail: rdavis@whww.com<br>E-Mail: lreynolds@whww.com<br>*Counsel for J & R Hewitt Investments Limited Partnership* | JAMES R. PALMER<br>_____<br><br>RON PALMER<br>_____<br><br>CONNIE JO PAYNE<br>_____<br><br>CHARLES M. PINCKNEY<br>_____<br><br>MATT HILL<br>_____<br><br>ADAM H, COHEN |

# EXHIBIT "B"

**THIS AGREEMENT WILL TAKE EFFECT UPON ENTRY OF AN ORDER FROM THE UNITED STATES BANKRUPTCY COURT, MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, DISPENSING WITH THE AUCTION PROCESS, AND APPROVING THIS AGREEMENT, AND WILL THEN BECOME BINDING ON THE PARTIES TO THIS AGREEMENT, AND THE PARTIES SHALL THEN BECOME OBLIGATED TO PERFORM UNDER THIS AGREEMENT.**

PURCHASE AND SALE AGREEMENT

BETWEEN

ROCHELLE HOLDINGS XIII, LLC a Florida limited liability company,
AS CHAPTER 11 DEBTOR IN POSSESSION

as Seller

AND

KELLY PARK VB DEVELOPMENT, LLC, a Florida limited liability company
as Buyer

Property: 202.5 acres of vacant land located at
4105 Golden Gem Parkway, Apopka, FL 32712

Dated as of: February 22, 2022

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is entered into as of the Effective Date (referenced on the cover page hereto) between ROCHELLE HOLDINGS XIII, LLC, a Florida Limited Liability Company, as debtor in possession (the "**Debtor**" or "**Seller**") and KELLY PARK VB DEVELOPMENT, LLC, a Florida limited liability company (the "**Buyer**"). Buyer and Seller are sometimes collectively referred to below as the "**Parties**" and each individually as a "**Party**."

## RECITALS

WHEREAS, Debtor is the owner of the real property located at 4105 Golden Gem Parkway, Apopka, Florida 32712, together with all improvements thereon and appurtenances thereunto, (the "**Land**") which Land is described on **Exhibit "A"** hereto.

WHEREAS, The Land is vacant.

WHEREAS, On July 15, 2021, Debtor filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Middle District of Florida – Orlando Division (the "**Bankruptcy Court**"). The case is pending in the Bankruptcy Court as Case No. 6:21-bk-03216-LVV (the "**Bankruptcy Case**"). Debtor's bankruptcy estate is referred to herein as the "**Estate.**"

WHEREAS, On January 10, 2022, the Bankruptcy Court entered the Bid Procedures Order (as defined below), thereby authorizing the Debtor to sell the Property by auction pursuant to the Order Approving Debtor Rochelle Holdings XIII, LLC's Amended Motion for Sale and Bid Procedures, Marketing Procedures and Related Relief (Doc. # 121), dated January 11, 2022.

WHEREAS, the Parties previously entered into that certain Purchase and Sale Agreement dated as of February 10, 2022 for the sale and purchase of the Land (the "**Stalking Horse Contract**"), relating to the proposed auction for the sale of the Land and the intent of the Parties for the Buyer to be designated as the "Stalking Horse Bidder" at the proposed auction.

WHEREAS, the parties, at the request of Buyer, and under the terms and conditions of this Agreement, seek to dispense with the auction process, and proceed with a straight sale of the real property that is the subject matter of this Agreement.

WHEREAS, Debtor believes that it is in the best interests of the Estate to enter into this Agreement to sell the Property (defined below) to Buyer upon the terms and conditions stated herein, and the Buyer wishes to purchase the Property from the Debtor, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

46980257 v1
0894184\195616\11598282v8

## AGREEMENT

1.  <u>Sale and Purchase of Property</u>. Subject to the terms and conditions of this Agreement and to the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title, and interest in the following (collectively, the "**Property**"):

    a.  The Land described in <u>Exhibit "A"</u> and located at 4105 Golden Gem Parkway, Apopka, Florida 32712, together with all of Seller's right, title, and interest in and to any property rights, easements, rights-of-way, hereditaments, appurtenances, entitlements, development rights, permits, approvals, and rights and profits derived from, related to, or appurtenant to the Land.

2.  <u>Additional Consideration</u>. As additional consideration, as part of Buyer's agreement with various parties, Buyer shall use commercially reasonable efforts to cause on the Closing Date each and all of HMG Venture Partner, LLC ("**HMG**"), PM S-1 REO, LLC ("**PMS**") Project Orlando, LLC ("**Project Orlando**"), and J & R Hewitt Investments Limited Partnership ("**Hewitt**") (collectively, the "**Claimants**") to:

    a.  Withdraw their Proofs of Claims filed in the within case;

    b.  Satisfy any and all judgments they have against the Debtor Rochelle Holdings XIII, LLC, including any members, agents, or employees;

    c.  Record a Satisfaction of Judgment against the Debtor Rochelle Holdings XIII, LLC, including any members, agents, or employees, including amending any judgment lien certificates with the Secretary of State, State of Florida, thereby terminating any Judgment liens;

    d.  Execute with respect to the Debtor Rochelle Holdings XIII, LLC, including any members, agents, or employees, a mutual general release; and

    e.  Vote in favor of the Chapter 11 Plan pending in this case, with the modification of the Plan to modify the plan from an auction to the approval of the sale under this Agreement, and the terms of this Agreement (the "Plan").

For the purposes of this Section 2, the foregoing requirements and conditions in subparagraphs a-e, inclusive, are collectively referred to as the "**Claimants Conditions**". The form and substance of the satisfaction and performance of the Claimants Conditions shall be subject to the approval of Buyer and Seller. In the event Buyer is unable to obtain and satisfy all of the Claimants Conditions and receive the Buyer Release (as hereinafter defined) on or before the Closing, then Buyer shall not be in default hereunder and Buyer shall be entitled to terminate this Agreement by written notice thereof to Seller and the Deposit shall be delivered and returned to Buyer by the Escrow Agent.

46980257 v1
0894184\195616\11598282v8

Debtor shall execute and Debtor and Buyer shall use commercially reasonable efforts to cause each of the Claimants (including all affiliates of the foregoing) to execute a general release on or prior to Closing, in form and substance satisfactory to Buyer, in favor of Buyer, its development company and each of their affiliates (collectively, the "Buyer Indemnified Parties") for any and all potential claims by any of such parties against the Buyer Indemnified Parties (the "Buyer Release"). In addition, Debtor shall include the following language in any proposed confirmation order and proposed sale order in the Bankruptcy Case: "By voting in favor of the Plan and by accepting payment of their claims under the Plan, all creditors of Debtor expressly release any and all claims, known or unknown, liquidated or unliquidated, that they may have against the Buyer Indemnified Parties that in any way concern the Property or any assets of Debtor."

3.    Court Approval; Termination of Stalking Horse Contract. The Parties' respective obligations to purchase and sell the Property pursuant to this Agreement are subject to: (a) Bankruptcy Court approval after notice and a hearing, and (b) the provisions, requirements, and limitations of the Sale Order (defined below). Upon the approval of this Agreement by the Bankruptcy Court, the Stalking Horse Contract automatically shall terminate and be of no further force and effect whatsoever.

4.    Purchase Price. The "Purchase Price" is $43,143,439 subject to adjustments. While the purchase price for the Property shall be $43,143,149 (the "Purchase Price"), it is subject to adjustment. The Purchase Price amount has been agreed to allow for the Debtor, Rochelle Holdings XIII, LLC, to receive a net of $7,750,000 at Closing, after the making of the payments referred to below but not taking into account any tax obligations that may exist for the Debtor, which shall be the sole responsibility of Debtor. If after paying all administrative claims and other allowable claims, and obligations due by and through this Chapter 11 case, the Debtor is not able to receive the net sum of $7,750,000 at Closing, Buyer and its assigns agree to immediately upon written request, supplement and pay an additional amount necessary for the Debtor, Rochelle Holdings XIII, LLC, to receive net proceeds at (or as a result of) Closing of $7,750,000 after factoring all obligations of the Debtor under and by virtue of this sale and the Chapter 11 case, including, but not limited to, payment of all allowed claims, payment of the Debtor's reasonable attorney's fees, payment of the US Trustee's fees, payment of any other allowed administrative expenses, and payment of the broker/auctioneer's fee (which is estimated to be $465,000), and any other commercially reasonable allowed fees and expenses (the "Supplemental Payment"). For the sake of clarity, Schedule I hereto provides an estimated calculation of all such contemplated claims, fees and expenses as of April 1, 2022, which Buyer and Seller agree is accurate and complete as of such date. Conversely, if the net sum to Debtor is in excess of $7,750,000 after the calculation of all such claims and expenses, the Purchase Price shall be reduced on a dollar-for-dollar basis at Closing.

5.    Buyer will pay the Purchase Price to Seller in the following manner:

a.    Buyer paid a deposit of ONE MILLION AND NO/100 DOLLARS ($1,000,000.00) (the "Initial Deposit"), which is held by Lawrence M. Kosto, Esquire and the Law Firm of Kosto & Rotella, P.A. (the "Escrow Agent"). On the Bankruptcy Court approving this Agreement, the Initial Deposit shall become earnest money security

for Buyer's performance of this Agreement and shall constitute the "Initial Deposit hereunder."

b.     Within three (3) Business Days of the Bankruptcy Court approving this Agreement, Buyer shall deliver to Escrow Agent an additional deposit (the "**Additional Deposit**") the amount of which is the difference between 10% of the Purchase Price and the Initial Deposit (such that the sum of the Initial Deposit and the Additional Deposit together shall equal 10% of the Purchase Price). The Additional Deposit will be wire transferred to Escrow Agent to be held in escrow in accordance with this Agreement.

c.     References in this Agreement to the "**Deposit**" mean the amount from time to time held by Escrow Agent pursuant to this Agreement. The Deposit will not accrue interest. At Closing, the Deposit will be delivered to Seller and applied toward payment of the Purchase Price due from Buyer.

d.     At Closing, Buyer will pay to Seller the balance of the Purchase Price (adjusted for prorations and other adjustments required in this Agreement) by wire transfer of immediate funds.

e.     Buyer will also pay at Closing the closing costs allocated in this Agreement to Buyer.

6.     <u>Time and Place of Closing.</u> Unless (a) otherwise agreed to by the Seller and Buyer in writing, or (b) a stay is imposed by a court of competent jurisdiction, the Closing shall occur no later than April 15, 2022, or at such other time as may be ordered by the Bankruptcy Court (the "**Closing Date**"). Notwithstanding any provisions to the contrary contained herein, so long as Buyer is not in default hereunder or has otherwise not caused delay of Closing (including, without limitation, if Buyer has been unable to obtain the satisfaction and performance of the Claimants Conditions), if Closing has not occurred within ninety (90) days after entry of an order approving this Agreement, then Buyer shall have the option to terminate this Agreement and receive back its Deposit, whereupon the Parties shall be released from any further obligations hereunder except for those that survive Closing. If Buyer invokes this option to terminate, and provided all of Buyer's conditions precedent to Closing hereunder have occurred or been satisfied, then Seller shall have the right in its discretion to cause Closing to occur within twenty-one (21) days after receiving notice of Buyer's election to terminate, in which event Buyer shall be obligated to close notwithstanding its previous election to terminate.

Closing will occur at the offices of Edward A. Kerben, Esq. (the "**Closing Agent**"), 725 N. Magnolia Ave., Orlando, Florida 32803. The Closing shall be an escrow closing through the Closing Agent.

a.     Notwithstanding any other provision of this Agreement, time is of the essence with respect to the Closing Date. No grace period, notice, or tender shall be required as a condition to declaring either Party in immediate default for failure to timely to close.

b.  Buyer acknowledges receipt of a commitment for an ALTA owner's title insurance policy from Old Republic National Title Insurance Company (the "**Title Company**"), with an effective date of January 7, 2022, Order No 1204825 (the "**Title Commitment**"), together with copies of all documents referenced therein. At Buyer's request and at Buyer's expense, at Closing, Closing Agent will issue owner's and lender's title insurance policies at the promulgated rate applicable thereto.

  i.  For purposes of this Agreement, the "**Permitted Exceptions**" include those exceptions (other than standard exceptions) described in, and other title matters disclosed in, the Title Commitment, together with: (i) taxes for the year of Closing and subsequent years (Seller shall pay taxes for previous years); (ii) all matters appearing on the Survey; and (iii) other matters affecting the Property and disclosed by this Agreement. Buyer accepts title for the Property subject to the Permitted Exceptions.

  ii.  If Buyer requests issuance of owner's or lender's title insurance policy, not later than five (5) days before Closing, Seller will provide to Buyer an updated Title Commitment bringing the effective date of the Title Commitment forward. If that updated Title Commitment reflects that title for the Property has since the previous effective date become subject to an adverse claim, defect, or other condition that is not a Permitted Exception (collectively, "**Subsequent Defects**"), unless Seller removes the Subsequent Defect such that the Title Company agrees to make no exception for it in the title insurance policy, Buyer will have the right in Buyer's discretion to terminate this Agreement by delivering written notice of termination to Seller before the Closing Date, in which event Escrow Agent shall return the Deposit to Buyer and the Parties shall be released from any further obligations under this Agreement, except for those that expressly survive termination of this Agreement. If Buyer fails before the Closing Date to deliver its notice of termination pursuant to this Section, Buyer shall be deemed to have waived the Subsequent Defects and elected to purchase the Property subject to them (and those Subsequent Defects shall become Permitted Exceptions).

c.  If the Bankruptcy Court does not discharge or remove from the title for the Property any monetary lien, mortgage, judgment, or other encumbrance securing payment for a liquidated sum (a "**Monetary Lien**"), then Seller may elect at or before Closing to satisfy or otherwise remove that Monetary Lien from title for the Property. If Seller fails or elects not to remove a Monetary Lien, the Buyer shall have the right before Closing to terminate this Agreement and receive back the Deposit.

d.  Buyer has reviewed and approved the Survey prepared by Allen & Company dated January 18, 2007, bearing Job No. 27002 (the "**Survey**"), provided, that, Buyer acknowledges that the survey includes land no longer owned by the Debtor, specifically, on or about April 17, 2012, the Debtor, Rochelle Holdings XIII, LLC,

conveyed to Freeport Rapids Partners, G.P. approximately 2.5 acres, from that property, thereby reducing the amount of land the Debtor owned, from the approximately 205 acres originally purchased from the Rissers, to the approximately 202.5 acres the Debtor now owns, and that is subject to this Agreement.

7. <u>Conveyance of Property</u>.   Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, at Closing Seller shall execute and deliver to Buyer the following instruments for the purpose of transferring and conveying the Property to Buyer:

    a.    Debtor's Warranty Deed (the "**Deed**") conveying the Property free and clear of all Liens in accordance with sections 363(b)and (f) of the Bankruptcy Code, with such Liens to attach to the proceeds of sale, but otherwise subject to the Permitted Exceptions.

    b.    The Closing Statement (defined below).

    c.    Assignment of Developer Rights, Permits, Agreements, Approvals, Fees and Deposits, provided that such Assignment shall be without any representations or warranties by the Seller whatsoever.

    d.    Such documents and agreements as may be customary or reasonably required of Debtor in order to implement and satisfy the Claimants Conditions.

    e.    Such other documents as may be customary (including a standard Seller's affidavit for purposes of the title policies), or as may be authorized or directed in the Sale Order, and documents reasonably required in order to perform this Agreement or to satisfy reasonable legal concerns. Each closing document shall be consistent with and implement applicable provisions of this Agreement and with the Sale Order.

8. <u>Buyer's Documents</u>.   Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, at Closing Buyer shall execute and deliver the following instruments:

    a.    The Closing Statement.

    b.    Such other documents as may be customary, or as may be authorized or directed in the Sale Order, and documents reasonably required in order to perform this Agreement or to satisfy reasonable legal concerns. Each closing document shall be consistent with and implement applicable provisions of this Agreement and with the Sale Order.

9. <u>Closing Expenses.</u>   Buyer will pay all costs of the Closing, and of transfer and conveyance of the Property, including without implied limitation documentary stamps required to be affixed to the deed, the cost of recording all instruments required to be recorded, the title insurance premiums and charges for related title services, costs and fees of the Closing Agent for Closing services (up to, but not exceeding, $1,000.00), the fees and expenses of

the Escrow Agent (up to, but not exceeding, $1,000.00), and the costs and fees for Buyer's own attorneys, accountants, and consultants; *provided*, that Seller shall request that the Bankruptcy Court include a provision in the Sale Order providing that the transfer of the Property shall be exempt from any documentary stamps on the deed and any mortgage; intangible tax on any mortgage; and any real estate transfer, mortgage recording, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code, as set forth herein.

10.    <u>Bankruptcy Court Approval</u>. Buyer's obligation to purchase, and Seller's obligation to sell, the Property are expressly contingent on and subject to the final entry by the Bankruptcy Court of the Sale Order (defined below in this Section) conforming to the requirements of this Agreement.

     a.    Notwithstanding the foregoing, the appointment of a Chapter 11 trustee, or the conversion or dismissal of the Bankruptcy Case, shall NOT relieve the Buyer of its duties under this Agreement, absent further order of the Bankruptcy Court.

     b.    Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Property to the Buyer in accordance with this Agreement and Seller shall vote (and cause the mezzanine lender in the Bankruptcy Case to vote) in favor of the Plan. Such order shall be subject to prior review and approval by Buyer and shall contain the following provisions (the **"Sale Order"**):

          i.    a finding that Seller prepared and mailed a motion requesting entry of the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to it;

          ii.    the sale and transfer of the Property to the Buyer is approved pursuant to Sections 105 and 363(f) of the Bankruptcy Code;

          iii.    Buyer will receive title for the Property free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens attaching to the sale proceeds, and otherwise in accordance with the requirements of this Agreement.

          iv.    a provision that the transfer of the Property from Seller to Buyer contemplated by this Agreement shall be exempt from any documentary stamps on the Deed and any mortgage, intangible tax on any mortgage, and any real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code; provided that, alternatively, such provision may be included in an order confirming the Debtor's plan of liquidation.

11.    <u>Acceptance of the Property "As Is"</u>. Buyer acknowledges Buyer was allowed thoroughly to investigate the Property, the title thereto and conditions thereon, and all components thereof before electing to participate in the Auction. In deciding to participate in the Auction and acquire the Property, Buyer has relied on Buyer's investigation of the Property conducted before the Auction.

46980257 v1
0894184\195616\11598282v8

a.   Buyer shall have no right or discretion whatsoever to terminate this Agreement because of conditions affecting or information concerning the Property of which Buyer becomes aware after the Effective Date, regardless of the nature of those conditions or information. Further, Seller's performing repairs or replacements to remedy conditions affecting the Property, or otherwise upgrading or improving any component of or condition affecting the Property, is not a condition of Buyer's obligation to purchase the Property.  Seller shall have no obligation to perform any such repairs or replacements, or to upgrade or improve any component of or condition affecting the Property.

b.   NOTWITHSTANDING ANY CONTRARY OR CONFLICTING PROVISION OF THIS AGREEMENT, BUYER SHALL AT CLOSING ACCEPT THE PROPERTY AS IS, WHERE IS, AND SUBJECT TO ALL FAULTS, DEFECTS, AND OTHER CONDITIONS, KNOWN AND UNKNOWN, PATENT AND LATENT. SELLER MAKES NO WARRANTIES OR REPRESENTATIONS RELATING TO THE PROPERTY, ITS CONDITION OR OPERATIONS, THE COST OR FEASIBILITY OF REPAIRING, RESTORING, OR UPGRADING THE PROPERTY, OR OTHER MATTERS EXCEPT THE WARRANTIES AND REPRESENTATIONS THAT ARE EXPRESSLY STATED IN THIS AGREEMENT.   SELLER DISCLAIMS ALL OTHER WARRANTIES, REPRESENTATIONS, AND GUARANTIES; AND BUYER AGREES NO OTHER WARRANTIES, REPRESENTATIONS, OR GUARANTIES FROM SELLER SHALL BE IMPLIED. BUYER BEARS ALL RISKS OF DEFECTS, FAULTS, AND OTHER CONDITIONS OF THE PROPERTY.   WITHOUT LIMITING THE FOREGOING, BUYER SHALL ACCEPT THE PROPERTY SUBJECT TO CONDITIONS, RESTRICTIONS, REQUIREMENTS, CONSTRAINTS, OBLIGATIONS, AND OTHER MATTERS IMPOSED BY OR ARISING FROM PERMITS, APPROVALS, LICENSES, FRANCHISES, ORDERS, DEVELOPMENT ORDERS, CERTIFICATES, ACCEPTANCES, RESERVATIONS, VARIANCES, SPECIAL EXCEPTIONS, AND OTHER AUTHORIZATIONS AND REQUIREMENTS OF GOVERNMENTAL OR QUASI-GOVERNMENTAL AUTHORITIES.

c.   During the term of this Agreement, Seller hereby grants to Buyer, and its consultants, contractors, agents and employees, a nonexclusive license and right to enter upon the Land for any reason or purpose whatsoever related to Buyer's performance of this Agreement as reasonably required, in Buyer's sole determination, including without limitation, to gain access thereto for the purpose of making physical tests and inspections of the Land such as environmental assessments, examination of soils, topography, water, geology, wetlands and other physical characteristics of the Land.  Buyer agrees to indemnify, defend and hold Seller harmless from and against any loss, cost, lien, encumbrance, claim or demand, including reasonable attorney's fees, paralegal's fees and costs incurred in connection with such entry, test or inspection by Buyer, its employees, agents or consultants. Buyer shall not engage in any activity that could result in a construction lien being filed against the Land without Seller's prior written consent.  If this transaction does not close, Buyer shall at Buyer's expense repair all damages to the

46980257 v1
0894184\195616\11598282v8

land resulting from the inspections and return the Land to the condition it was in before conducting the inspections. These provisions of this paragraph shall survive the termination of this Agreement and/or the Closing.

d.    During the term of this Agreement, Buyer shall be entitled to pursue and/or apply for any permits, approvals and other entitlements required or desired by Buyer, for its intended development use of the Land, from any local, State of Florida, Federal Agency, or other governmental or quasi-governmental agency or body having jurisdiction over the Land and Buyer's intended use. Seller agrees to cooperate with the Buyer in seeking such governmental approvals, and Seller shall consent to and/or join in such applications or requests for the governmental approvals as reasonably requested by Buyer.

12.    <u>Prorations and Adjustments</u>. The items of revenue and expense set forth in this Section shall be prorated between the Parties (the "**Prorations**") as of 11:59 p.m. on the day preceding the Closing Date (the "**Cut-Off Time**"), or such other time expressly provided in this Section, so that the Closing Date is a day of income and expense for Buyer.

a.    <u>Taxes</u>. All Taxes (real and personal property) shall be prorated as of the Cut-Off Time between Seller and Buyer. If the amount of such Taxes is not ascertainable on the Closing Date, the proration for such Taxes shall be based on the most recent available bill.

b.    <u>Utilities</u>. All utility services shall be prorated as of the Cut-Off Time between Seller and Buyer. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Buyer by estimating such cost based on the most recent bill for such service. Seller shall receive a credit for all deposits transferred to Buyer or which remain on deposit for the benefit of Buyer with respect to any utility contract.

c.    <u>Insurance</u>. Buyer shall not assume any of Seller's existing insurance policies and shall have no obligations in connection therewith.

d.    <u>Other Adjustments and Prorations</u>. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of property similar to the Property shall be adjusted and prorated between Seller and Buyer accordingly. In this regard, the Buyer shall pay and deliver the Supplemental Payment, if any, to Escrow Agent at Closing, subject to a later adjustment, if the costs in the Bankruptcy Court prove to bring the net amount below the $7.75 million minimum threshold. Upon the final reconciliation and calculation of the costs in the Bankruptcy Court and the written approval thereof by Seller and Buyer, Escrow Agent shall disburse and pay to the Debtor such portion of the Supplemental Payment due and payable to Debtor under this Agreement and Escrow Agent shall release and return any remaining portion of the Supplemental Payment to Buyer. In the event all or any portion of the Supplement Payment has not been released and disbursed by Escrow Agent within two (2) Business Days after the Closing,

then Escrow Agent shall immediately disburse all of such portion of the Supplemental Payment to Buyer. At Closing, Seller, Buyer and Escrow Agent shall enter into an escrow agreement, in form and substance acceptable to each in their reasonable discretion, more specifically providing for the deposit and disbursement of the Supplemental Payment.

The Parties jointly shall prepare prior to Closing a closing statement (the "**Closing Statement**"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement.

13.    Representations and Warranties of Seller. Seller represents and warrants to Buyer that Seller is the Chapter 11 debtor in possession and that, subject to the entry of the Sale Order, and that without any contrary order being obtained by any Party in interest, Seller has the power to convey the Property to Buyer pursuant to this Agreement, subject to Bankruptcy Court approval.

14.    Representations and Warranties of Buyer. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

a.    This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

b.    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, and any rules, regulations, permits, licenses and orders promulgated thereunder.

15.    Default and Remedies.

a.    If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

b.    If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order, or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy (i) receive a return of its Deposit and terminate this Agreement by notice to Seller; or (ii) Buyer may seek specific performance of this Agreement, unless such remedy is not authorized under the terms of the Sale Order.

16.    Seller's Right to Cure. Notwithstanding any contrary provision of this Agreement, Seller shall not be deemed (a) in default of any covenant or obligation hereunder, (b) to have

given a false, incorrect, or misleading representation or warranty hereunder, (c) or otherwise to have violated the terms of this Agreement, (all of the foregoing events of default being referred to in this Section as a "**Default**") unless Buyer first notifies Seller in writing of the Default and Seller fails within fourteen (14) days after receipt of that notice to cure the Default (a cure including without limitation, if applicable, effecting the changes necessary to render a warranty or representation correct). If Seller cures the alleged Default within the permitted period, then Seller shall be deemed not to be in default hereof.

17.   Casualty Loss; Condemnation.

a.   Termination.  If, prior to Closing, all or any material portion of the Property is subject to a taking by a public authority (a "**Material Taking**"), then Seller shall promptly notify Buyer of such Material Taking.  Buyer shall have the right to terminate this Agreement by written notice given to Seller within ten (10) days after Seller's notification to Buyer of a Material Taking, as applicable.  If Buyer elects to terminate this Agreement as aforesaid, then the Deposit shall be returned to Buyer and Buyer and Seller shall thereafter be relieved of further liability hereunder, except to the extent survival of any obligation or liability is expressly provided herein.

b.   Non-Termination.  In the event that (i) Buyer does not elect to terminate this Agreement pursuant to Section 16(a); or (ii) prior to Closing any non-material portion of the Property is subject to a taking by a public authority (a "**Non-Material Taking**"), the Buyer shall accept the Property in its then condition and proceed with the Closing without any abatement of the Purchase Price whatsoever, in which event, at Closing, all of the insurance proceeds (including, without limitation, any assignable business interruption insurance proceeds payable for losses incurred after Closing, but not before Closing), condemnation award, or right to such proceeds or condemnation award, shall be assigned by Seller to Buyer, and any monies theretofore received by Seller that have not been used by Seller on account of any reasonably necessary repairs or restorations in connection with such damages or other casualty or condemnation shall be paid over to Buyer.

c.   Notice; Materiality.  Seller shall give Buyer prompt notice of any damage to or destruction of the Property or of the institution of any proceedings for condemnation of all or any portion of the Property. For the purposes of this Section, damage to, or the taking of, a portion of the Property shall be deemed to be "material" if the estimated cost of restoration or repair of the damage or diminution of the value of the remaining Property on account of a taking, as the case may be, exceeds Five Million Dollars ($5,000,000.00).

d.   Survival.  The terms of this Section shall survive Closing and the delivery of the Deed.

18.   Indemnification. Buyer and Seller shall indemnify and hold each other harmless from the claims of any broker or finder claiming through either of Buyer or Seller. The provisions of this Section shall survive the Closing and any termination of this Agreement.

19.    <u>Escrow Instructions.</u>  This Agreement shall constitute the escrow instructions for Escrow Agent.  Escrow Agent will hold and dispose of the Deposit in accordance with the following provisions and with other applicable provisions of this Agreement.

     a.     If any dispute arises concerning disposition of the Deposit, Escrow Agent may retain the Deposit until receipt by Escrow Agent of written instructions signed by both Parties directing the manner in which Escrow Agent should dispose of the Deposit.  Escrow Agent may at any time, but is not required to, bring an action to interplead the Deposit pending a final determination of the disputants' rights.

     b.     Escrow Agent shall incur no liability to any person whomsoever in connection with the Deposit or actions taken or omissions occurring in connection with this Agreement, except liability for Escrow Agent's gross negligence or willful misconduct.  Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Escrow Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

     c.     Escrow Agent shall have no liability for the failure of any institution in which Escrow Agent deposits the Deposit. The Deposit will not accrue interest while controlled by Escrow Agent.

     d.     The Parties, jointly and severally, agree to indemnify, defend, and hold Escrow Agent harmless from all fines, penalties, claims, damages, losses, expenses (including without limitation court costs and attorneys' fees incurred by Escrow Agent before all tribunals), obligations, or liabilities arising in connection with the handling or disposition of the Deposit.

     e.     If conflicting demands relating to this Agreement are made upon the Escrow Agent, the Parties hereto expressly agree that the Escrow Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Escrow Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

20. <u>Notices.</u> All notices, elections and other communications permitted or required in this Agreement ("**Notice**") will be in writing, signed by the Party making the Notice, and will be: (i) delivered personally, or (ii) sent by reputable overnight delivery service or by registered or certified mail, return receipt requested, or (iii) transmitted by facsimile or email (with a copy via one of the other aforesaid means) to the other Party at the addresses provided in this Agreement. The date of Notice will be the date of personal delivery, consignment for overnight delivery, mailing, or email or facsimile transmission, as the case may be, unless otherwise specified herein. Notices delivered by or to the attorney for a Party through one of the methods listed above will be deemed given by or to, as the case may be, the applicable Party.

a. Notice to Seller will be delivered to: Rochelle Holdings, XIII, LLC, 260 Wekiva Springs Road, Suite 2030, Longwood, FL 32779; email to: mhill@pralawfirm.com.

b. A copy of any Notice to Seller will be simultaneously delivered to Seller's attorneys, Lawrence M. Kosto, Esq., Kosto & Rotella, P.A., 619 E. Washington Street, Orlando, FL 32801; email to: lkosto@kostoandrotella.com; telephone at (407) 425-3456.

c. Notice to Buyer will be delivered to: Kelly Park VB Development, LLC, ATTN: Ronald L. Edwards, Manager, 660 Beachland Blvd., Suite 301, Vero Beach, FL 32963; email to redwards@evansprop.com; telephone at (772) 234-2410.

d. A copy of any Notice to Buyer will be simultaneously delivered to Buyer's attorney: Kevin M. Barry, Esq., Rossway Swan Tierney Barry & Oliver, P.L., 2101 Indian River Blvd., Suite 200, Vero Beach, FL 32960; email: kbarry@rosswayswan.com; telephone: (772) 231-4440.

e. Notice to Escrow Agent will be delivered to: Lawrence M. Kosto, Esq., Kosto & Rotella, P.A., 619 E. Washington Street, Orlando, FL 32801; email to: lkosto@kostoandrotella.com; telephone at (407) 425-3456.

21. <u>Successors and Assigns.</u> Buyer will have such rights to assign this Agreement as are granted by the Sale Order, subject to the conditions and requirements of the Sale Order. If the Sale Order is silent concerning Buyer's right to assign this Agreement, Buyer will have no right to assign this Agreement without first receiving Seller's consent to assign, provided that Buyer may assign this Agreement to an affiliate of Buyer.

a. In the event of Buyer's assignment of this Agreement, Buyer shall remain liable in all respects for performance of, and all obligations and liabilities arising from, this Agreement.

b. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective heirs, personal representatives, successors and assigns.

c. If either Party consists of more than one person, all such persons shall be jointly and severally liable under this Agreement.

22. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts. The signature of any Party to a counterpart shall be deemed to be the signature to, and may be appended to, any other counterpart. A Party shall be bound by this Agreement by executing a counterpart hereof, then transmitting the executed counterpart to the other Parties via email in .pdf or similar format.

23. <u>Attorneys' Fees.</u> If either Party initiates or is made a Party to legal proceedings (whether judicial, administrative, declaratory, in arbitration, or otherwise) in connection with this Agreement, then the nonprevailing Party in those proceedings will pay the costs and attorney's fees, including the costs and attorney's fees of appellate proceedings, incurred by the prevailing Party.

24. <u>Rules of Construction</u>.

a. As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and Schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

b. Each Party and its counsel have reviewed this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

c. Time is of the essence of this Agreement. Except with respect to the Additional Deposit, which must be provided within 24-hours after completion of the Auction, the time in which any act is to be done under this Agreement is computed by excluding the first day and including the last day, unless the last day is not a Business Day in which case that day is also excluded. Unless otherwise expressly provided for herein to the contrary, time periods of five days of less will be Business Days and time periods of five days or more will be calendar days. "**Business Days**" means all days other than Saturday, Sunday, and federal holidays. Federal holidays will include the day immediately following Thanksgiving Day, the day immediately following Christmas Day, and the day immediately following New Year's Day.

Each time period shall expire at 5:00 P.M. (Orlando, Florida time) on the last day of the applicable time period.

25.     Miscellaneous.

a.      This Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

b.      The Deposit, Purchase Price, and other payments due from Buyer under this Agreement shall be remitted in immediate funds by federal wire transfer in accordance with wire transfer instructions provided by the required recipient, Seller, Escrow Agent, or Closing Agent.

c.      This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

d.      Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement, except as otherwise provided for herein. Seller acknowledges and agrees that Seller is obligated to properly report the proceeds received hereunder under all applicable tax laws, and Seller agrees to and acknowledges the obligation to pay all taxes, if any, relating to the receipt of proceeds and other benefits under this Agreement. Seller further agrees to indemnify Buyer and hold it harmless to the extent of any obligation imposed on Buyer as relates in any way to Seller's tax obligations.

e.      This Agreement shall not be recorded by Buyer. Any attempt to record this Agreement or any memorandum hereof or any reference hereto by Buyer or any agent or representative of Buyer shall, at the sole option of Seller, constitute a material default by Buyer, in which event Escrow Agent shall deliver the Deposit to Seller and Buyer shall execute and deliver such documents, and take such other actions, as Seller may require in order to evidence of record that Buyer has no right, title, claim, or interest in the Property.

f.      Notwithstanding any other provision of this Agreement, any representation, warranty, or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

g.      Seller and Buyer will, without additional consideration, sign, acknowledge, and deliver any other documents and take any other action necessary or appropriate and

46980257 v1
0894184\195616\11598282v8

reasonably requested by the other to carry out the intent and purpose of this Agreement.

h.    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

i.    The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either Party of the benefit contemplated herein, is invalid and shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

j.    No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

k.    Whenever provision is made in this Agreement for one Party to indemnify the other Party with respect to any claim or risk, such provision shall be interpreted to mean that the Party (in this Section **"Indemnitor"**) indemnifying the other Party (in this Section **"Other"**) agrees to indemnify, defend, and hold harmless the Other from and against any and all fines, penalties, losses, expenses, obligations, claims, suits, actions, damages, or liabilities, including reasonable attorneys' fees, which the Other may incur or to which it may become subject as a result of or in connection with, and to the extent caused by, the described claim or risk.

l.    The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, nor shall any such third party have any rights hereunder.

m.    This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

46980257 v1
0894184\195616\11598282v8

n.     BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

o.     Buyer acknowledges receipt of the Bid Procedures Order, and represents that it has either had its counsel review and advise Buyer regarding the terms of the Bid Procedures Order, or that Buyer has had the opportunity to have counsel review the Bid Procedures Order. Buyer agrees to be bound by the terms and conditions of the Bid Procedures Order and the Bid Procedures approved thereby. Any omission from this Agreement of any condition, obligation, or requirement contained in the Bid Procedures Order shall not relieve Buyer of such condition, obligation, or requirement. Buyer acknowledges that it is entering into this Agreement, and upon the Closing shall take the Property, subject to the terms, conditions, and requirements of the Bid Procedures Order, and the Sale Order.

26.     <u>Exhibits</u>.  The following Exhibits referenced elsewhere in this Agreement are attached hereto and incorporated herein by reference:

a.     **Exhibit "A"** - Description or Depiction of the real property.

[The Parties have signed on the following page.]

46980257 v1
0894184\195616\11598282v8

[Signature page to Purchase and Sale Agreement]

**BUYER:**

**KELLY PARK VB DEVELOPMENT,
LLC,** a Florida limited liability company


By: _____
       Ronald L. Edwards
Title:  Manager



Date: _____, 2022

**SELLER:**

**ROCHELLE HOLDINGS XIII, LLC,**
a Florida limited liability company


By: _____
       Mathew Hill
Title:  Managing Member



Date: _February 22_, 2022

**EXHIBIT A**

**LEGAL DESCRIPTION**

A PORTION OF THE WEST 1/2 OF SECTION 13, TOWNSHIP 20 SOUTH, RANGE 27 EAST, ORANGE COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTH 1/4 CORNER OF SECTION 13, TOWNSHIP 20 SOUTH, RANGE 27 EAST, ORANGE COUNTY, FLORIDA; THENCE RUN NORTH 89°49'52" WEST, ALONG THE SOUTH LINE OF THE SOUTHWEST 1/4 OF SAID SECTION 13, FOR A DISTANCE OF 1356.86 FEET; THENCE DEPARTING SAID SOUTH LINE, RUN NORTH 00°08'4 1" EAST, FOR A DISTANCE OF 2147.97 FEET; THENCE RUN NORTH 89°58'09" WEST, ALONG THE NORTH LINE OF THE SOUTH 800 FEET OF THE NORTHWEST 1/4 OF THE SOUTHWEST 1/4 OF SAID SECTION 13, FOR A DISTANCE OF 1321.42 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY LINE OF GOLDEN GEM ROAD, AS RECORDED IN OFFICIAL RECORDS BOOK 6 I. PAGE 315 OF THE PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA; THENCE DEPARTING SAID NORTH LINE, RUN NORTH 00° 1 7'25" EAST, ALONG SAID EASTERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 544.78 FEET; THENCE RUN NORTH 01 °08'04" EAST, ALONG SAID EASTERLY RIGHT OF WAY LINE, FOR A DISTANCE OF 2603.70 FEET; THENCE DEPARTING SAID EASTERLY RIGHT OF WAY LINE, RUN SOUTH 89°27'40" EAST, ALONG THE NORTH LINE OF THE NORTHWEST 1/4 OF SAID SECTION 13, FOR A DISTANCE OF 1324.32 FEET; THENCE DEPARTING SAID NORTH LINE, RUN SOUTH 00°34'14" WEST, ALONG THE WEST LINE OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13, FOR A DISTANCE OF 853.16 FEET; THENCE DEPARTING SAID WEST LINE, RUN SOUTH 89°47'15" EAST, FOR A DISTANCE OF 160.19 FEET; THENCE RUN SOUTH 00°12'45" WEST, FOR A DISTANCE OF 30.00 FEET; THENCE RUN SOUTH 89°47'15" EAST, ALONG A LINE PARALLEL WITH THE SOUTH LINE OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13, FOR A DISTANCE OF 476.16 FEET; THENCE RUN SOUTH 00°17'10" WEST, FOR A DISTANCE OF 395.99 FEET; THENCE RUN SOUTH 89°47'15" EAST, ALONG THE SOUTH LINE OF THE NORTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13, FOR A DISTANCE OF 668.5 1 FEET TO A POINT ON THE EAST LINE OF THE WEST 1/2 OF SAID SECTION 13; THENCE DEPARTING SAID SOUTH LINE, RUN SOUTH 00°00'00" EAST, ALONG SAID EAST LINE, FOR A DISTANCE OF 1042.54 FEET; THENCE DEPARTING SAID EAST LINE, RUN NORTH 90°00'00" WEST, FOR A DISTANCE OF 500.00 FEET; THENCE RUN SOUTH 00°00'00" EAST, FOR A DISTANCE OF 1776.1 1 FEET; THENCE RUN SOUTH 90°00'00" EAST, FOR A DISTANCE OF 500.00 FEET TO A POINT ON THE AFORESAID EAST LINE OF THE WEST 1/2 OF SECTION 13; THENCE RUN SOUTH 00°00'00" EAST, FOR A DISTANCE OF 1185.59 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPT THAT PORTION DESCRIBED IN WARRANTY DEED RECORDED IN O.R. BOOK 10369. PAGE 190. PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA. BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF NORTHWEST 1/4 OF SECTION 13. TOWNSHIP 20 SOUTH. RANGE 27 EAST OF ORANGE COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT THE NORTHEAST CORNER OF THE NORTHWEST 1/4 OF SECTION 13-20-27; THENCE RUN S 00°00'00" W ALONG THE EAST LINE OF THE NORTHWEST 1/4 OF SECTION 13 FOR A DISTANCE OF 1301.77 FEET TO A POINT ON THE NORTHEAST CORNER OF THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13. SAID POINT ALSO BEING THE POINT OF BEGINNING; THENCE RUN S 00°00'00" W FOR A DISTANCE OF 325.44 FEET TO A POINT ON THE SOUTH LINE OF THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13; THENCE RUN N 89°52'05" W ALONG SAID SOUTH LINE FOR A DISTANCE OF 335.07 FEET TO A POINT ON THE WEST LINE OF THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13; THENCE RUN N 00°08'36" E ALONG SAID WEST LINE FOR A DISTANCE OF 325.91 FEET TO A POINT ON THE NORTH LINE OF THE SOUTHEAST 1/4 OF THE NORTHWEST 1/4 OF SAID SECTION 13; THENCE RUN S 89°47'15" E ALONG SAID NORTH LINE FOR A DISTANCE OF 334.25 FEET TO THE AFORESAID POINT OF BEGINNING.

## SCHEDULE I

### Estimated claim, costs and expenses

See Attached.

|  |  | Risser Principal, Interest, and Attorney Fees |
|---|---|---|
|  |  | Nicholson Principal, Interest, and Attorney Fees |
| $ | 33,038,439 | Secured Debt and Atty Fees |
|  |  | Administrative Court Costs |
| $ | 33,188,439 | Secured Debt, Atty Fees, Court Costs |
|  |  | KOSTO & ROTELLA, P.A. |
|  |  | US Trustee Fees |
|  |  | Contingency |
| $ | 33,578,439 | Total Secured Debt, Attorney Fees, Court Costs |
|  |  |  |
|  |  | Debtor Net Amount |
|  |  | Hewitt Family |
|  |  | HMG/PMS1 Funds |
|  |  | Auctioneer |
| $ | 9,565,000 | Subtotal of Unsecured |
| $ | 43,143,439 | **Buyer Balance Due to Court** |